IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ANALISA ARAIZA VILLALBA, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| V. | § | CIVIL ACTION NO. 17-2114 |
| | § | |
| NANCY BERRYHILL, ACTING | § | |
| COMMISSIONER OF THE SOCIAL | § | |
| SECURITY ADMINISTRATION, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM AND ORDER GRANTING
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Before the Magistrate Judge[1] in this social security appeal is Defendant's Motion for Summary Judgment and Brief in Support (Document No. 20). After considering the cross motion for summary judgment, the administrative record, and the applicable law, the Magistrate Judge ORDERS, for the reasons set forth below, that Defendant's Motion for Summary Judgment (Document No. 20) is GRANTED and the decision of the Commissioner is AFFIRMED.

**I. Introduction**

Plaintiff, Analisa Araiza Villalba ("Villalba") brings this action pursuant to the Social Security Act ("Act"), 42 U.S.C. § 405(g) (2012), seeking judicial review of a final decision of the Commissioner of Social Security Administration ("Commissioner") denying her applications for Disability Insurance Benefits and Supplemental Security Income payments. Villalba challenges the Commissioner's finding that she is not under a disability as unsupported by

---

[1] The parties consented to proceed before the undersigned Magistrate Judge on December 1, 2017 (Document No. 19).

substantial record evidence and relevant legal standards. The Commissioner argues that there is substantial evidence in the record to support the ALJ's decision that Villalba was not disabled, that the decision comports with applicable law, and that the decision should, therefore, be affirmed.

## II. Administrative Proceedings

On July 5, 2013, Villalba filed for disability insurance benefits claiming she has been disabled since July 1, 2011, due to "sjernces," anemia, bulging back discs, and "cardio megaly" (Tr. 243-252, 272). The Social Security Administration denied her application at the initial and reconsideration stages. (Tr. 127-128, 153-154). Villalba then requested a hearing before an ALJ. (Tr. 181-183). The Social Security Administration granted her request, and the ALJ held a hearing on August 4, 2015, at which Plaintiff and a vocational expert testified. (Tr. 70-109). On December 8, 2015, the ALJ issued his decision finding Villalba not disabled. (Tr. 54-62).

Villalba sought review by the Appeals Council of the ALJ's adverse decision. (Tr. 48-50). The Appeals Council will grant a request to review an ALJ's decision if any of the following circumstances are present: (1) it appears that the ALJ abused his discretion; (2) the ALJ made an error of law in reaching his conclusion; (3) substantial evidence does not support the ALJ's actions, findings, or conclusions; (4) a broad policy issue may affect the public interest or (5) there is new and material evidence and the decision is contrary to the weight of all the record evidence. After considering Villalba's contentions in light of the applicable regulations and evidence, the Appeals Council, on February 9, 2017, concluded that there was no basis upon which to grant Villalba's request for review. (Tr. 1-7). The ALJ's findings and decision thus became final. (Tr. 54-62).

Villalba has timely filed her appeal of the ALJ's decision. The Commissioner has filed a Motion for Summary Judgment (Document No. 20). This appeal is now ripe for ruling.

The evidence is set forth in the transcript, pages 1 through 1193. (Document No. 15). There is no dispute as to the facts contained therein.

## III. Standard for Review of Agency Decision

The court, in its review of a denial of disability benefits, is only "to [determine] (1) whether substantial evidence supports the Commissioner's decision, and (2) whether the Commissioner's decision comports with relevant legal standards." *Jones v. Apfel*, 174 F.3d 692, 693 (5th Cir. 1999). Indeed, Title 42, Section 405(g) limits judicial review of the Commissioner's decision as follows: "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). The Act specifically grants the district court the power to enter judgment, upon the pleadings, and transcript, "affirming, modifying, or reversing the decision of the Commissioner of Social Security with or without remanding the case for a rehearing" when not supported by substantial evidence. *Id.* While it is incumbent upon the court to examine the record in its entirety to decide whether the decision is supportable, *Simmons v. Harris*, 602 F.2d 1233, 1236 (5th Cir. 1979), the court may not "reweigh the evidence in the record nor try the issues de novo, nor substitute its judgment" for that of the Commissioner even if the evidence preponderates against the Commissioner's decision. *Chaparro v. Bowen*, 815 F.2d 1008, 1009 (5th Cir. 1987); *see also Jones* at 693; *Cook v. Heckler*, 750 F.2d 391, 392 (5th Cir. 1985). Conflicts in the evidence are for the Commissioner to resolve. *Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992).

The United States Supreme Court has defined "substantial evidence," as used in the Act, to be "such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). Substantial evidence is "more than a scintilla and less than a preponderance." *Spellman v. Shalala*, 1 F.3d 357, 360 (5th Cir. 1993). The evidence must create more than "a suspicion of the existence of the fact to be established, but no 'substantial evidence' will be found only where there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'" *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983) (quoting *Hemphill v. Weinberger*, 483 F.2d 1127 (5th Cir. 1973)).

## IV. Burden of Proof

An individual claiming entitlement to disability insurance benefits under the Act has the burden of proving her disability. *Johnson v. Bowen*, 864 F.2d 340, 344 (5th Cir. 1988). The Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). The impairment must be proven through medically accepted clinical and laboratory diagnostic techniques. *Id.* § 423(d)(3). The impairment must be so severe as to limit the claimant in the following manner:

> [s]he is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which [she] lives, or whether a specific job vacancy exists for [her], or whether [she] would be hired if [she] applied for work.

*Id.* § 423(d)(2)(A). The mere presence of an impairment is not enough to establish that one is suffering from a disability. Rather, a claimant is disabled only if she is "incapable of engaging in any substantial gainful activity." *Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992) (quoting *Milan v. Bowen*, 782 F.2d 1284 (5th Cir. 1986)).

4

The Commissioner applies a five-step sequential process to determine disability status:

1. If the claimant is presently working, a finding of "not disabled" must be made;

2. If the claimant does not have a "severe" impairment or combination of impairments, she will not be found disabled;

3. If the claimant has an impairment that meets or equals an impairment listed in Appendix 1 of the Regulations, disability is presumed and benefits are awarded;

4. If the claimant is capable of performing past relevant work, a finding of "not disabled" must be made; and

5. If the claimant's impairment prevents her from doing any other substantial gainful activity, taking into consideration her age, education, past work experience, and residual functional capacity, she will be found disabled.

*Id.*, 954 F.2d at 293; *see also Leggett v. Chater*, 67 F.3d 558, 563 n.2 (5th Cir. 1995); *Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991). Under this formula, the claimant bears the burden of proof on the first four steps of the analysis to establish that a disability exists. If successful, the burden shifts to the Commissioner, at step five, to show that the claimant can perform other work. *McQueen v. Apfel*, 168 F.3d 152, 154 (5th Cir. 1999). Once the Commissioner demonstrates that other jobs are available, the burden shifts, again, to the claimant to rebut this finding. *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990). If, at any step in the process, the Commissioner determines that the claimant is or is not disabled, the evaluation ends. *Leggett*, 67 F.3d at 563.

In the instant action, the ALJ determined, in his December 8, 2015 decision that Villalba was not disabled at step four. In particular, the ALJ determined that Villalba had not engaged in substantial gainful activity since July 1, 2011, the alleged onset date, and that she met the insured status requirements of the Act through December 31, 2015 (step one); that Villalba's obesity, degenerative disc disease of the lumbar spine, bilateral carpal tunnel syndrome, sleep apnea, chronic obstructive pulmonary disease with oxygen use, and hypertension were severe

impairments (step two); that Villalba did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in Appendix 1 of the regulations (step three); that Villalba had the RFC to perform a limited range of sedentary work. In particular,

> [s]he can lift up to ten pounds occasionally, less than ten pounds frequently. She can stand or walk for about 2 hours, and sit for at least six hours in an eight-hour workday, with customary breaks. The claimant is precluded from climbing ladders, ropes and scaffolds, and crawling, but she can occasionally climb ramps, stairs, balance, stoop, kneel and crouch, and frequently reach. The claimant should avoid concentrated exposure to extreme cold and excessive vibration, avoid all exposure to industrial hazards, and avoid even moderate exposure to environmental irritants such as fumes, dust, gases, odors, poorly ventilated areas, open chemicals and flammable materials. (Tr. 59).

The ALJ further found that, based on Villalba's RFC, she was able to perform her past relevant work as a medical receptionist and as an admissions clerk (step four). As a result, the Court must determine whether substantial evidence supports the ALJ's step four finding.

In determining whether substantial evidence supports the ALJ's decision, the court weighs four factors: (1) the objective medical facts; (2) the diagnosis and expert opinions of treating, examining and consultative physicians on subsidiary questions of fact; (3) subjective evidence as testified to by the plaintiff and corroborated by family and neighbors; and (4) the plaintiff's educational background, work history, and present age. *Wren*, 925 F.2d at 126.

## V. Discussion

### A. Objective Medical Evidence

The objective medical evidence shows that Villalba has been treated for cardiomegaly, hypertension, degenerative disc disease of the lumbar spine, bilateral carpal tunnel, anemia, sleep apnea, chronic obstructive pulmonary disease, menorrhagia, morbid obesity, depression and anxiety.

6

The record contains treatment records from South Florida Baptist Hospital between January 12, 2011 to September 19, 2014. These records indicate that Villalba received treatment at South Florida Baptist Hospital on nineteen separate occasions over this time period for a variety of impairments.[2] For example, on May 4, 2011, Villalba received treatment for a cough, chest pain, and numbness in her left arm and shoulder. Elise Zahn, MD, conducted an electrocardiogram and a chest x-ray. Dr. Elise Zahn noted that Villalba's lungs sounded clear and non-labored, and found no abnormalities. On June 14, 2011, Villalba was seen by Dr. Elise Zahn regarding difficulty breathing. A physical examination revealed symmetrical chest wall expansion and regular respirations. A chest x-ray showed no acute disease process, and Villalba was treated for bronchitis. Villalba again received treatment for chest pain on July 16, 2011, by Hope Wooten, MD. A CT and an x-ray of claimant's chest revealed mild cardiomegaly and mild pulmonary vascular prominence, but demonstrated no pulmonary embolus or any other significant abnormality. Villalba was diagnosed with "chest pain: uncertain cause." On February 25, 2012, Villalba was treated by James Bartlett, MD, for a cough and chest congestion. Dr. James Bartlett conducted a physical examination and a chest x-ray, and noted that claimant's lungs were well-expanded, clear, and free of intrathoracic disease. However, claimant was diagnosed with pneumonia and prescribed antibiotics. Villalba was seen by Dr. Elise Zahn again on March 28, 2012, for breast pain. However, a physical examination revealed clear lungs and non-labored, equal breath sounds. Villalba was prescribed medication for the pain. Finally,

---

[2] The record reveals that Villalba was treated at South Florida Baptist Hospital on January 12, 2011 (Tr. 484), May 4, 2011 (Tr. 744), June 14, 2011 (Tr. 657), July 16, 2011 (Tr. 518), February 25, 2012 (Tr. 606, 922), March 28, 2012 (Tr. 918), May 10, 2012 (Tr. 629), June 14, 2012 (Tr. 576), April 5, 2013 (Tr. 687), June 28, 2013 (Tr. 553), July 3, 2013 (Tr. 688), August 23, 2013 (Tr. 689), October 22, 2013 (Tr. 473, 697), February 18, 2014 (Tr. 926, 959), March 5, 2014 (Tr. 868, 928), April 1, 2014 (Tr. 866), June 29, 2014 (Tr. 930), July 15, 2014 (Tr. 861), and September 19, 2014 (Tr. 778).

Villalba sought treatment for a cough and congestion on May 10, 2012, alleging intermittent pneumonia since January 12, 2012. A physical examination, electrocardiogram, and chest x-ray indicated no abnormalities or cardiopulmonary disease. A nasal swab test came back negative for influenza A and B protein antigens, Dr. Hope Wooten treated Villalba for influenza.

Medical records show that Villalba was also treated for back and hip pain. On July 3, 2013, an MRI of Villalba's lumbar spine revealed mild degenerative change at L2-3. Villalba sought treatment for lightheadedness, nausea, heart palpitations, and shortness of breath on August 23, 2013. Numerous tests were conducted, including a metabolic panel, a brain CT, an electrocardiogram, a chest x-ray, a urinalysis, and an MRI of claimant's lumbar spine. The brain CT was unremarkable. While the results of the chest x-ray were interpreted as indicating no cardiopulmonary disease, the results of the electrocardiogram were interpreted as "abnormal," and noted that pulmonary disease should be considered. The MRI of Villalba's spine revealed mild disc protrusion and mild multilevel spondylosis. Aside from claimant's high blood pressure, a physical examination presented no abnormalities. Ultimately, Villalba received a diagnosis of heart palpitations and hypertension. An MRI of claimant's lumbar spine on February 18, 2014, revealed mild degenerative disease without stenosis or impingement and mild facet arthritis without stenosis. The radiologist opined that there were "no findings to explain patient's symptoms" of "back pain with numbness and tingling." On June 28, 2013, Villalba sought treatment for right hip pain. Matthew Fucarino, MD, conducted a physical exam and noted that Villalba was able to walk without difficulty. An ultrasound revealed no abnormalities. Unable to find the cause of claimant's pain, Dr. Matthew Fucarino recommended over-the-counter pain medication.

The record also contains treatment records from Suncoast Community Health Centers beginning July 24, 2012 and continuing until August 27, 2014. Villalba received treatment for a variety of impairments at a July 24, 2012, appointment with Kathleen Flach, PA.[3] Villalba complained of pain in her abdomen and legs, as well as negative side effects of her blood pressure medication. Dr. Flach conducted a physical examination and noted abdominal tenderness, and that Villalba had difficulty walking. Dr. Flach adjusted claimant's blood pressure medications and prescribed pain medication. On October 31, 2012, Villalba was again treated by Dr. Flach. Dr. Flach prescribed medication for a cough, adjusted claimant's blood pressure medications, and advised claimant to continue taking potassium tablets for hypokalemia (which claimant insisted was the cause of her back pain). Villalba reviewed the x-rays on her spine with Brian Shaub, D.O., on July 5, 2013. The x-ray results revealed mild degenerative changes in the lumbar and thoracic spine. Villalba was seen by Saroja Medidi, M.D., on September 25, 2013, for a follow-up of an MRI on her lumbar spine. The results of the MRI showed mild disc protrusion. Villalba also complained of pain in her hands which she attributed to carpal tunnel. Villalba stopped wearing wrist splints at night. Villalba tested positive for Tinel's and Phalen's sign. Dr. Saroja Medidi advised claimant to resume wearing the wrist splints at night and to take over-the-counter pain medication as needed.

---

[3] Villalba received treatment from Suncoast Community Health Centers on July 24, 2012 (Tr. 448), October 22, 2012 (Tr. 446), October 31, 2012 (Tr. 443), January 3, 2013 (Tr. 437), January 14, 2013 (Tr. 458), April 10, 2013 (Tr. 435), July 3, 2013 (Tr. 433), July 5, 2013 (Tr. 431), July 11, 2013 (Tr. 429), August 1, 2013 (Tr. 427), September 25, 2013 (Tr. 814), November 1, 2013 (Tr. 816), December 2, 2013 (Tr. 818), December 9, 2013 (Tr. 819), January 24, 2014 (Tr. 822), February 28, 2014 (Tr. 824), May 16, 2014 (Tr. 827), May 29, 2014 (Tr. 830), August 27, 2014 (Tr. 832), and November 6, 2014 (Tr. 885).

Villalba began seeing Brenda Dukes, D.C., at Dukes Chiropractic Health Clinic in May 2012 for her back pain.[4] Dr. Brenda Dukes diagnosed Villalba with degenerative disc disease. (Tr. 933).

Starting on October 31, 2012 and continuing until July 11, 2013, Villalba sought treatment for general impairments at the Tom Lee Community Health Center.[5] On October 31, 2012 Villalba received a chest x-ray for a cough. Vimal Patel, M.D., noted no abnormalities. On November 10, 2012, Villalba received a CT of her chest. Keith Ferguson, M.D., interpreted the x-ray results and noted that they were unremarkable. In fact, Dr. Ferguson commented that claimant's heart appeared normal in size, and that her lungs were clear with no air space opacities. The remainder of Villalba's appointments at the Tom Lee Community Health Center consisted of routine follow-ups and maintenance of her high blood pressure and anemia. (Tr. 378-393).

Villalba saw a cardiologist at Southshore Cardiovascular Associates from November 8, 2012 through February 13, 2014. Harshinder Singh, M.D., was claimant's treating physician.[6] On November 9, 2012, Dr. Harshinder Singh conducted a 24-hour electrocardiogram report, and concluded that claimant had an irregular heart rhythm due to a premature heartbeat. A nuclear stress test revealed that Villalba was positive for inducible ischemia. However, Dr. Singh noted

---

[4] Villalba was seen by Dr. Brenda Dukes on May 7, 2012 (Tr. 912), July 10, 2014 (Tr. 933), July 11, 2014 (Tr. 934), July 18, 2014 (Tr. 934), July 21, 2014 (Tr. 935), August 6, 2014 (Tr. 935), August 13, 2014 (Tr. 935), and August 25, 2014 (Tr. 936)

[5] The records show that Villalba was treated at Tom Lee Community Health Center on October 31, 2012 (Tr. 418), November 1, 2012 (Tr. 417), November 10, 2012 (Tr. 416), January 14, 2013 (Tr. 413), January 18, 2013 (Tr. 407), March 18, 2013 (Tr. 787), March 28, 2013 (Tr. 402), May 10, 2013 (Tr. 393), June 24, 2013 (Tr. 378), and July 11, 2013 (Tr. 378).

[6] Villalba was seen by Dr. Harshinder Singh on November 18, 2012 (Tr. 359), November 9, 2012 (Tr. 364), November 28, 2012 (Tr. 363, 374), December 4, 2012 (Tr. 357), January 11, 2013 (Tr. 356, 362), April 11, 2013 (Tr. 354), July 1, 2013 (Tr. 351), November 4, 2013 (Tr. 845), and February 13, 2014 (Tr. 849).

that "overall left ventricular systolic function is normal." A cardiac echo revealed normal systolic function with an ejection fraction of 55-60%. An electrocardiogram conducted on January 11, 2013, showed normal sinus rhythm and function. Villalba saw Dr. Singh for a follow-up on November 4, 2013. Because Villalba had shortness of breath, Dr. Singh limited her activities to moderate to heavy exertion. Regarding Villalba's obstructive sleep apnea, Dr. Singh advised Villalba to exercise, lose weight, and participate in a sleep study. At another follow-up appointment on February 13, 2014, Dr. Singh began treatment for chronic obstructive pulmonary disease (COPD), without providing his reasoning or noting claimant's symptoms which led to this diagnosis.

Villalba received treatment for anemia and hypokalemia from Florida Cancer Specialists by Shalin Shah, D.O., from January 18, 2013 until May 22, 2014.[7] The records from Florida Cancer Specialists are limited to claimant's blood-related disorders, namely anemia, hypertension, menorrhagia, and vitamin-D deficiency.

A disability report was completed on July 24, 2013 following a face-to-face interview with Villalba. (Tr. 260-270). The interviewer observed that Villalba had no difficulty with, among other things, writing, using her hands, seeing, walking, standing, sitting, concentrating, understanding, or reading. (Tr. 269).

Villalba received eye-care treatment from Brandon Eye Associates from August 6, 2013 until April 21, 2014. Haroon Ilyas, M.D., was her treating physician. Over this time period,

---

[7] The records indicate that Villalba was treated at Florida Cancer Specialists on January 18, 2013 (Tr. 311), August 6, 2013 (Tr. 833), August 9, 2013 (Tr. 987), August 16, 2013 (Tr. 986), August 23, 2013 (Tr. 985), August 30, 2013 (Tr. 979), September 6, 2013 (Tr. 977), September 13, 2013 (Tr. 976), September 20, 2013 (Tr. 975), October 11, 2013 (Tr. 835, 970), December 6, 2013 (Tr. 837, 968), February 7, 2014 (Tr. 839, 963), February 21, 2014 (Tr. 841, 954, 957), February 25, 2014 (Tr. 952), March 4, 2014 (Tr. 951), March 11, 2014 (Tr. 950), March 18, 2014 (Tr. 948), April 9, 2014 (Tr. 945), April 16, 2014 (Tr. 944), May 22, 2014 (Tr. 843, 938), July 15, 2014 (Tr. 857), and September 4, 2014 (Tr. 857).

Villalba was treated for a variety of eye disorders, including conjunctivitis, dry eye syndrome, glaucoma suspect, dermatochalasis, drusen of retina, vitreous detachment, and citreous floaters.[8] Claimant was advised to use artificial tears and to control her blood pressure.

From September 26, 2013 until September 4, 2014 Villalba received treatment at Florida Gastroenterology Associates. Her treating physicians were Ziauddin Shamsi, M.D., and Yawer Nensey, M.D. Villalba went for an array of gastrointestinal issues, including abdominal pain, a fatty liver, H. Pylori, hemorrhoids, acid reflux, ulcers, gastritis, esophagitis, and chronic cholecystitis.[9] On October 22, 2013, Villalba had a colonoscopy and endoscopy. (Tr. 465)

In conjunction with her pending benefit application, a disability determination unit physician reviewed the medical records and formulated a Residual Function Capacity Assessment. (Tr. 110-117). Dr. Barker opined that Villalba's "severe" impairments included anemia, Sjogren's syndrome, hypertension, and obesity. Dr. Barker also found that she could lift up to 20 pounds occasionally, and up to 10 pounds frequently, could stand and walk for a total of four hours, and could sit for a total of six hours. (Tr. 115). She could also occasionally climb ramps, stairs, ladders, and ropes, balance, stoop, kneel, crouch, and crawl. (Tr. 115). She had no manipulative limitations and no visual limitations. (Tr. 115).

---

[8] The records show that Villalba had appointments at Brandon Eye Associates on August 6, 2013 (Tr. 784), March 5, 2014 (Tr. 783), March 21, 2014 (Tr. 782), April 7, 2014 (Tr. 812), and April 21, 2014 (Tr. 780).

[9] The records reveal that Villalba received treatment in association with Dr. Yawer Nensey and Dr. Ziauddin Shamsi on September 26, 2013 (Tr. 879), October 22, 2013 (Tr. 465, 875), November 7, 2013 (Tr. 875), February 18, 2014 (Tr. 872), March 5, 2014 (Tr. 907), April 2, 2014 (Tr. 905), April 21, 2014 (Tr. 868), May 30, 2014 (Tr. 863, 909), June 17, 2014 (Tr. 863), July 15, 2014 (Tr. 904), and September 19, 2014 (Tr. 910).

Villalba began seeing a neurologist, Thomas DiGeronimo, M.D., on October 30, 2013. Her last appointment was on December 27, 2013.[10] Villalba saw Dr. DiGeronimo on October 30, 2013, for complaints of numbness in her hands and pain in her lower back. After conducting a physical examination, Dr. DiGeronimo treated claimant for limb pain, facet syndrome, carpal tunnel, and Enthesopathy. Dr. DiGeronimo instructed Villalba to wear her wrist splints at bedtime. Villalba underwent a nerve conduction study on November 13, 2013. Results revealed that Villalba has "severe bilateral carpal tunnel syndrome worse on the right." On November 27, 2013, claimant underwent trigger point and carpal tunnel injections in her wrists. Claimant again saw Dr. DiGeronimo on December 27, 2013, for numbness in each of her hands. Villalba complained that the wrist injections received at the prior appointment were not very helpful. Dr. DiGeronimo provided another injection on claimant's left wrist, but noted that "she will require surgical intervention."

Another physical Residual Functional Capacity assessment was conducted on January 14, 2014 by Charles Moore, M.D. (Tr. 131-141). Dr. Moore found that Villalba's severe impairments consisted of anemia, Sjogren's syndrome, hypertension, obesity, "disorders of the female genital organs," and spine disorders. Dr. Moore also determined that she was capable of lifting 20 pounds occasionally and 10 pounds frequently, could stand and walk for a total of four hours, and could sit for a total of six hours every workday. (Tr. 135-136). Further, Villalba could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl, but could never climb ladders, ropes, and scaffolds. (Tr. 136-137). She had no manipulative or visual limitations. (Tr. 137).

---

[10] Villalba was seen by Dr. DiGeronimo on October 30, 2013 (Tr. 461), November 13, 2013 (Tr. 1056), November 27, 2013 (Tr. 801), and December 27, 2013 (Tr. 802).

Villalba began seeing Divyang Sorathia, M.D., at Tampa Bay Pulmonary Medicine for treatment of sleep apnea. Villalba was treated by Dr. Divyang Sorathia from January 14, 2014 until January 26, 2015.[11] At her initial visit, Dr. Sorathia advised Villalba to reduce her weight and scheduled a sleep study. The sleep study was conducted on January 17, 2014, by Rakesh Shah, M.D. Dr. Shah concluded that Villalba showed signs of severe obstructive sleep apnea with hypoxia, which was mostly resolved using Bi-PAP therapy. Villalba was again advised to reduce her weight, and prescribed a Bi-PAP machine to use throughout the night. Villalba underwent a pulmonary function test (PFT) on March 13, 2014. The results of the PFT revealed positive significant bronchodilator response, positive restrictive lung disease, and a reduction in diffusing capacity for carbon monoxide. Dr. Sorathia saw Villalba at Brandon Regional Hospital on December 19, 2014, for an upper respiratory infection. Dr. Sorathia's treatment notes show that a chest x-ray revealed no evidence of pulmonary disease, and that a ventilation-perfusion scan came back negative for pulmonary embolism. At a follow-up visit on December 29, 2014, Villalba was diagnosed with asthma.

Villalba was referred to Scott Goldsmith, M.D., at Orthopedic Medical Group of Tampa Bay. She was treated by Dr. Goldsmith on two occasions. On February 3, 2014, Villalba complained of numbness and tingling in both hands. (Tr. 805). Although claimant insisted that she had difficulty gripping objects, and often drops things, Dr. Goldsmith's treatment notes indicate that claimant had the ability to make a complete fist, complete extension, normal reflexes and full range of motion at the elbow and wrist, and normal grip and pinch strength. (Tr. 806). Based on a review of the nerve conduction study results from Dr. DiGeronimo, Dr.

---

[11] The records indicate that Villalba was treated by Dr. Divyang Sorathia on January 14, 2014 (Tr. 851, 900), January 17, 2014 (Tr. 898), February 11, 2014 (Tr. 854), March 13, 2014 (Tr. 902), April 8, 2014 (Tr. 852), December 19, 2014 (Tr. 1091), December 29, 2014 (Tr. 894), and January 26, 2015 (Tr. 882, 891).

Goldsmith diagnosed Villalba with carpal tunnel. (Tr. 806). Dr. Goldsmith recommended right carpal tunnel release surgery. The right carpal tunnel release surgery was scheduled for February 20, 2014. (Tr. 807). Villalba later shared with Dr. Shalin Shah that she cancelled this surgery because she felt that she was better off reserving her strength. (Tr. 841). Villalba was again seen by Dr. Goldsmith on September 24, 2014, for pain in her left knee. (Tr. 888). A physical exam revealed that claimant had full range of motion in left knee and full strength and range of motion in her left ankle. (Tr. 888). However, an x-ray showed "significant medial joint line narrowing of her left knee." (Tr. 888). Dr. Goldsmith diagnosed Villalba with osteoarthritis, gave her an injection of medication, and sent her home with a home-exercise program to be conducted multiple times throughout the day for twenty minutes at a time. (Tr. 889).

Villalba was hospitalized at Brandon Regional Hospital on numerous occasions.[12] On February 3, 2014, Villalba was seen by Derek Eisnor, M.D., for a cough, chest pain, and shortness of breath. A chest x-ray revealed no cardiopulmonary disease. Villalba was again seen by Dr. Eisnor on June 14, 2014, for pain in her left knee. Using imaging of claimant's lower extremities, Dr. Eisnor ruled out lower extremity deep venous thrombosis, and diagnosed claimant with degenerative joint disease. On December 15, 2014, Villalba sought treatment at the emergency room for shortness of breath. Jorge Perez, M.D., administered an echocardiogram, which showed 60% ejection fraction, and diastolic dysfunction. Dr. Perez diagnosed Villalba with grade 2 diastolic dysfunction and hypoxia. Villalba was prescribed antibiotics, pain killers, and oxygen for at-home use.

---

[12] Records indicate that Villalba was hospitalized or received treatment at Brandon Regional Hospital on February 2, 2014 (Tr. 1123), April 7, 2014 (Tr. 1107), June 14, 2014 (Tr. 1098), December 15, 2014 (Tr. 1076), December 19, 2014 (Tr. 1091), and February 7, 2015 (Tr. 1064).

After moving from Florida to Texas, Villalba began receiving treatment at Legacy Community Health for a variety of problems.[13] On April 21, 2015, Villalba was seen by Louise Henson, M.D., for depression and anxiety. Dr. Henson conducted a "depression screening." She questioned whether Villalba had experienced a lack of interest in doing things, or whether she had been feeling depressed or hopeless. Villalba denied experiencing such feelings. To screen for anxiety, Dr. Henson asked Villalba whether she had recently experienced a feeling of nervousness or a feeling of being "on edge," and whether she had been unable to control her worrying. Again, Villalba responded in the negative. Dr. Henson conducted a mental status exam and noted "mood & affect: no depression, anxiety, or agitation." Dr. Henson diagnosed Villalba with depression and anxiety.

Villalba was seen again by Dr. Henson for depression and anxiety on June 8, 2015. Villalba stated that her depression and anxiety is "the one everyone else experiences," and that she was unaware why she was there. A mental status assessment was conducted and summarized as follows:

**Attitude & Behavior**: appropriate, candid, cooperative, good eye contact, polite responsive

**Motor activity**: normal gait, normal posture

**Speech activity**: normal flow, normal pace, normal pressure, normal rate, spontaneous, soft-spoken

**Mood**: pleasant

**Affect**: congruent, normal intensity, normal range

**Sensorium**: alert, attentive, clear

---

[13] The record indicates that Villalba was treated at Legacy Community Health on April 21, 2015 (Tr. 1041), June 8, 2015 (Tr. 1034), July 9, 2015 (Tr. 1028), September 11, 2015 (Tr. 1150), and July 9, 2015 (Tr. 1159).

**Process**: able to abstract, goal-directed, logical

**Thought & Perception**: lucid

**Hallucinations**: none

**Intellectual Functioning**: adequate fund of information, intact memory processes, oriented to person, oriented to place, oriented to time, oriented to situation, oriented to reality

**Insight**: good

**Judgement**: good

Villalba was diagnosed with depressive disorder. No medication was prescribed. Dr. Henson noted that she "doesn't meet the criteria for any form of pharmaceutical management." At follow-up appointments, Villalba stated that she was no longer feeling depressed or anxious.[14]

At the ALJ's request, Villalba underwent a consultative physical examination on August 22, 2015 with Yazan Suradi, MD. (Tr. 1134-1149). Dr. Yazan Suradi summarized the results of Villalba's physical examination as follows:

**VITAL SIGNS:**
BP (with medium cuff) – 184/115
HR – 78

**HEIGHT** 5 feet, 3 inches (without shoes)

**WEIGHT** 366 pounds (without shoes)

**CARDIOVASCULAR**: Jugular venous pressure is less than 7 cm. There was a regular rate and rhythm without murmurs, rubs or gallop. (See chart below)

| | L/R | | L/R |
|---|---|---|---|
| **Carotid** 3+/3+ | | **Radial** 3+/3+ | |
| **Dorsalis** 3+/3+ | Pedis | **Posterior** 3+/3+ | Tibialis |

---

[14] Villalba also told Kelly Gabler, M.D., that she had not recently been feeling anxious or depressed on July 9, 2015 (Tr. 1028, 1159) and September 11, 2015 (Tr. 1150).

**LUNGS**: The lungs were clear to auscultation. Decreased air entry bilaterally. Patient has oxygen nasal cannula she uses all the time.

**ABDOMEN**: Soft, non-tender, non-distended with normally active bowel sounds. No organomegaly or mass appreciated.

**EXTREMITIES**: There was no clubbing, cyanosis, or edema.

**SKIN**: No lesions appreciated.

**NEUROLOGIC**:
General: Patient was alert and had good eye contact and fluent speech. Mood was appropriate and she had clear thought processes. Ptient's memory was normal and concentration was good. The patient was oriented to time, place, persons and situation.

**CRANIAL NERVES**: Cranial nerves 2-12 were grossly intact.

**CEREBELLAR**: The patient had symmetric gait. Hand eye coordination was good.

**MUSCLES**: The patient had no palpable muscle spasms. Muscle strength is shown on the chart below. (Out of 5)

|                    | **L** | **R** |                       | **L** | **R** |
|--------------------|-------|-------|-----------------------|-------|-------|
| Deltoids:          | 4     | 4     | Hip flexion:          | 5     | 5     |
| Biceps:            | 5     | 5     | Hip extension:        | 5     | 5     |
| Triceps:           | 5     | 5     | Hip Abduction:        | 5     | 5     |
| Wrist flexion:     | 5     | 5     | Hip adduction:        | 5     | 5     |
| Wrist extension:   | 5     | 5     | Leg flexion:          | 5     | 5     |
| Finger abduction:  | 5     | 5     | Leg extension:        | 5     | 5     |
| Hand grip:         | 5     | 5     | Ankle plantar flexion:| 5     | 5     |
|                    |       |       | Ankle dorsi-flexion:  | 5     | 5     |

**NERVES**: Sensory examination was normal to pinprick and light touch throughout. The patient's straight leg test was positive at 70 degrees on the right.

**REFLEXES**: Symmetric in biceps, brachioradialis, patellar and Achilles distribution. (See details on reflex chart below).

| Reflexes:          | L / R   |                 | L / R    |
|--------------------|---------|-----------------|----------|
| Patellar           | 0+ /0+  | Brachioradialis | 1+ /1+   |
| Ankle (Achilles)   | 1+ /1+  | Biceps          | 1+ / 1+  |

**MUSCULOSKELETAL**:
No joint swelling, erythema, effusion, deformity or tenderness. The patient was able to lift, carry and handle light objects. Patient was able to perform fine motor skills such as

opening doors, buttoning shirts, manipulating a coin, etc. Patient was able to squat and rise from that position with moderate difficulty. Patient was able to rise from a sitting position without assistance and had some difficulty getting up and down from the exam table. The patient was unable to walk on heels and toes. Tandem walking was abnormal. The patient could not stand or hop on one foot bilaterally. Patient could dress and undress adequately well and was cooperative and gave good effort during the examination. (Tr. 1136-1139).

As part of this physical examination, Dr. Suradi completed a form regarding his opinion of Villalba's ability to do "work-related activities." (Tr. 1140-1149). Dr. Suradi's evaluation was largely consistent with the longitudinal medical record, with the exception of his assertion that Villalba was capable of lifting and carrying 100 pounds. (Tr. 1140). Dr. Suradi found that Villalba could sit for a total of four hours, stand for a total of one hour, and walk for a total of 30-60 minutes throughout an 8-hour work day. (Tr. 1141). Dr. Suradi found that Villalba could occasionally (one-third of the time) climb stairs, ramps, and ladders, balance, stoop, kneel, crouch, and crawl. (Tr. 1143). Dr. Suradi found that Villalba was capable of engaging in activities such as shopping, traveling alone, using public transportation, preparing meals and caring for her personal hygiene without assistance, and sorting and handling papers or files. (Tr. 1145). Lastly, Dr. Suradi reported that all of Villalba's range of motion measurements were within normal limits. (Tr. 1147-1149).

Villalba was hospitalized at Methodist San Jacinto Hospital on November 23, 2015, for abdominal pain. (Tr. 1169). A CT scan of claimant's abdomen and pelvis revealed no abnormalities, except for a "ventral hernia present with only fat extending through the hernia." (Tr. 1169). Villalba was prescribed Bentyl and discharged on November 24, 2015. (Tr. 1175).

Here, substantial evidence supports the ALJ's finding that the claimant's alleged impairments of depression and anxiety are not severe. The ALJ wrote:

The claimant's medically determinable mental impairments of anxiety and depression, considered singly and in combination, do not cause more than minimal limitation in the claimant's ability to perform basic mental work activities and are therefore Nonsevere.

In making this finding, I considered the four broad functional areas set out in the disability regulations for evaluating mental disorders and in section 12.00C of the Listing of Impairments (20 CFR, Part 202, Subpart P, Appendix 1). These four broad functional areas are known as the "paragraph B" criteria.

Although the medical record establishes that the claimant experiences some depression and anxiety, she testified during the hearing that she has been able to maintain a marital relationship with her husband for five years. In addition, she currently participates in the care of a teenaged foster child. Although the claimant was unable to complete high school graduation equivalency because of the demands of being a working spouse and mother, she testified that she is literate and able to complete ordinary mathematical computations and operate a computer. Although the claimant does appear to have experienced an appetite disturbance, the disturbance appears to be associated with compliance with her medications.

On further examination, the claimant testified that she is able to be at home alone and that she does engage in some housework such as sweeping, bed making and folding clothes during the day. In addition, the claimant admitted during the hearing that she is not currently taking any medications to control depression. It is noted that the vocational expert testified later in the hearing that the claimant has an extensive history of employment as a semi-skilled victim's advocate and receptionist.

Based on the foregoing evidence, I find that in the domain of activities of daily living, the claimant has mild limitation. The next functional area is social functioning. In this area, the claimant has mild limitation. The third functional area is concentration, persistence or pace. In this area, the claimant has mild limitation. The fourth functional area is episodes of decompensation. In this area, the claimant has experienced no episodes of decompensation which have been of extended duration.

Because the claimant's medically determinable mental impairments cause no more than a "mild" limitation in any of the first three functional areas and "no" episodes of decompensation which have been of extended duration in the fourth area, they are nonsevere (20 CFR 404.1520a(d)(1) and 416.920a(d)(1)).

Substantial evidence also supports the ALJ's finding that Villalba's obesity, lower back pain, carpal tunnel, sleep apnea, pulmonary disease, and hypertension were severe impairments at step two, but that such impairments at step three, individually or in combination, did not meet or equal a listed impairment. The ALJ addressed listings 1.04, 7.02, 14.20, and Social Security

Ruling 02-1p and concluded that Villalba did not meet or equal the listings. Substantial evidence

supports this determination. As for listings 1.04, 7.02, 14.20, and Social Security Ruling 02-1p,

the ALJ wrote:

> The claimant's orthopedic conditions do not meet the diagnostic and severity criteria of
> Section 1.04 of the above-noted Listing of Impairments because she does not experience
> nerve root compression, arachnoiditis or lumbar spinal stenosis resulting in
> pseudoclaudication. Moreover, the claimant's impairments do not meet the diagnostic
> and severity criteria of Section 7.02 of the above-noted Listing of Impairments because
> she does not require one or more blood transfusions on average of at least once every two
> months. Finally, the claimant's immune disorder does not meet the diagnostic and
> severity criteria of Section 14.20 of the Listing of Impairments because the record does
> not establish that it involves two or more organs or body systems causing at least two of
> the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary
> weight loss) and markedly limited activities of daily living, social functioning or
> limitation in completing tasks in a timely manner due to deficiencies in concentration,
> persistence, or pace. As noted above, the claimant's mental impairments are not "severe"
> within the parameters of applicable legal authority, so they do not meet the diagnostic
> and severity criteria of Sections 12.04 or 12.06 of the Listings of Impairments.
>
> In addition to being considered within the parameters of the above-noted Listing of
> Impairments, the complications associated with the claimant's obesity have been
> evaluated pursuant to Social Security Ruling 02-1p. Social Security Ruling 02-1p
> provides that obesity is a complex, chronic disease characterized by excessive
> accumulation of body fat. Obesity is generally the result of a combination of factors (e.g.,
> genetic, environmental and behavioral). Obesity is considered a "severe" impairment
> when, alone or in combination with another medically determinable physical or mental
> impairment(s), it significantly limits an individual's physical or mental ability to do basic
> work activities.
>
> Obesity can cause limitation of function in any of the exertional functions such as sitting,
> standing, walking, lifting, carrying, pushing, and pulling. It may also affect ability to do
> postural functions, such as climbing, balancing, stooping, and crouching. The ability to
> manipulate may be affected by the presence of adipose tissue in the hands and fingers.
> The ability to tolerate extreme heat, humidity, or hazards may also be affected. The
> combined effects of obesity with other impairments may be greater than might be
> expected without obesity. For example, someone with obesity and arthritis affecting a
> weight-bearing joint may have more pain and limitation than might be expected from the
> arthritis alone.

Substantial evidence supports the ALJ's determination that Villalba did not meet or equal listings

1.04, 7.02, or 14.20.

RFC is what an individual can still do despite her limitations. It reflects the individual's maximum remaining ability to do sustained work activity in an ordinary work setting on a regular and continuing basis. SSR 96-8p, 1996 WL 374184, at *2 (SSA July 2, 1996). The responsibility for determining a claimant's RFC is with the ALJ. *see Villa v. Sullivan*, 895 F.2d 1019, 1023-24 (5th Cir. 1990). The ALJ is not required to incorporate limitations in the RFC that he did not find to be supported by the record. *See Muse v. Sullivan*, 925 F.2d 785, 790 (5th Cir. 1991). Here, the ALJ carefully considered all of the objective medical evidence in formulating an RFC that addressed Villalba's impairments. The ALJ's RFC determination is consistent with the record as a whole. The ALJ concluded, based on the totality of the evidence, that Villalba could perform less than the full range of sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a). Villalba can lift up to ten pounds occasionally, and less than ten pounds frequently. She can stand and walk for about two hours, sit for at least six hours, is unable to climb ramps, stairs, balance, stoop, kneel, and crouch, and she can frequently reach. Additionally, Villalba should avoid concentrated exposure to extreme cold and excessive vibration, all exposure to industrial hazards, and even moderate exposure to environmental irritants, including fumes, dust, gases, odors, poorly ventilated areas, open chemicals, and flammable materials.

The ALJ cited to objective evidence contained in the medical records in support of the RFC. For example, when analyzing what limiting effects resulted from obesity, the ALJ specifically noted that Villalba had a body mass index of 63, which classifies her as morbidly obese. (Tr. 56-61) The ALJ acknowledged that claimant's obesity causes an increase in limitation of function. (Tr. 58). Additionally, the ALJ mentioned that no abnormalities were observed in a chest x-ray in October 2012 or a CT scan of her chest in November 2012. (Tr. 60). Likewise, claimant's neurological functioning was normal and her blood pressure remained

stable with medication. Although the objective medical record supports the diagnosis of degenerative disc disease of the lumbar spine, her treating physician characterized the pain as "mild," and progress notes indicate that she had full ranges of motion in all of her joints at that time. (Tr. 60). Claimant was also observed walking with a normal gait and exhibited normal strength in all of her muscles. (Tr. 60). This factor weighs in favor of the ALJ's decision.

## B. Diagnosis and Expert Opinion

The second element considered is the diagnosis and expert opinions of treating and examining physicians on subsidiary questions of fact. The ALJ must evaluate every medical opinion in the record and decide what weight to give each. *See* 20 C.F.R. § 404.1527(c). The law is clear that "a treating physician's opinion on the nature and severity of a patient's impairment will be given controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with . . . other substantial evidence." *Newton*, 209 F.3d at 455. The ALJ may give little or no weight to a treating source's opinion, however, if good cause is shown. *Id.* at 455-56. The Fifth Circuit in *Newton* described good cause as where the treating physician's evidence is conclusory, is unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence. *Id.* at 456. "[A]bsent reliable medical evidence from a treating or examining physician controverting the claimant's treating specialist, an ALJ may reject the opinion of the treating physician only if the ALJ performs a detailed analysis of the treating physician's views under the criteria set forth in 20 C.F.R. § 404.1527(d)(2)." *Id.* at 453. The six factors that must be considered by the ALJ before giving less than controlling weight to the opinion of a treating source are: (1) the length of treatment relationship; (2) frequency of examination; (3) nature and extent of the treatment relationship; (4) the support of the source's opinion afforded by the

medical evidence of record; (5) the consistency of the opinion with the record as a whole; and (6) the specialization of the source. 20 C.F.R. § 404.1527(d)(2); *Newton*, 209 F.3d at 456. An ALJ does not have to consider the six factors "where there is competing first-hand medical evidence and the ALJ finds as a factual matter that one doctor's opinion is more well-founded than another," and where the ALJ weighs the treating physician's opinion on disability against the medical opinion of other physicians who have treated or examined the claimant and have specific medical bases for a contrary opinion." *Id.* at 458; *Alejandro v. Barnhart*, 291 F.Supp.2d 497, 507-11 (S.D.Tex. 2003).

In addition to the rules about treating physicians, opinions from examining physicians must be considered. *Kneeland v. Berryhill*, 850 F.3d 749, 760 (5th Cir. 2017). Generally, more weight is given to the opinion of a medical professional who has examined a claimant than to one who has not. Id. (citing 20 C.F.R. § 404.1527(c)). "And fundamentally, '[t]he ALJ cannot reject a medical opinion without explanation.'" *Id.* (quoting *Loza v. Apfel*, 219 F.3d 378, 395 (5th Cir. 2000)).

Lastly, ALJs are to consider findings of fact made by state agency consultants as the opinions of non-examining physicians. SSR 96-6P, 1996 WL 374180 at *2. They are not bound by the opinions, but they may not ignore them and must explain the weight given to the opinions in their decisions. *Id.* The opinions of state agency consultants can be given weight only insofar as they are supported by evidence in the case record, considering factors such as supportability of the opinion in the evidence, consistency with the record as a whole, including other medical opinions, and any explanation given by the consultant. *Id.*

Regardless of the opinions and diagnoses of medical sources, "the ALJ has sole responsibility for determining a claimant's disability status." *Martinez*, 64 F.3d at 176. "The

ALJ's decision must stand or fall with the reasons set forth in the ALL's decision, as adopted by the Appeals Council." *Id.* at 455; *see also Cole v. Barnhart*, 288 F.3d 149, 151 (5th Cir. 2002) ("It is well-established that we may only affirm the Commissioner's decision on the grounds which he stated for doing so."). However, perfection in administrative proceedings is not required. *See Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988).

The Commissioner contends that the ALJ properly weighed the medical opinions and performed an analysis of the opinion evidence. According to the Commissioner, the ALJ summarized the medical evidence and explained the weight accorded to the opinions of the medical sources. With respect to the opinions and diagnoses of treating physicians and medical sources, the ALJ wrote:

> Largely consistent with the record of medical treatment as it existed before the Administration at that time, a State Agency medical expert evaluated such record in January 2014 and determined that the claimant can perform a limited range of light work. More specifically, the State Agency physician determined that the claimant's capacity for light work is limited by her preclusion from climbing ladders, ropes and scaffolds and her inability to climb stairs, climb ramps, balance, stoop, kneel, crouch, and crawl on more than an occasional basis. The State Agency physician also determined that the claimant is unable to tolerate exposure to extreme heat or concentrated exposure to pulmonary irritants and hazards (Ex. 7A).

> Somewhat consistent with the longitudinal medical record in this case, the claimant underwent a consultative physical examination by Dr. Yazan Suradi in August 2015. Although the consulting physician appears to have failed to examine the full treatment record in this case leading to an obviously flawed conclusion that the claimant can lift and carry up to one-hundred pounds, it appears that he recognized that she requires customary breaks from sitting and standing and that she is limited to occasional postural activities such as stair climbing, ramp climbing, stooping and crouching (Ex. 28F).

> As for the opinion evidence, because of the partial consistency of such findings with the objective observations reported in the record of treatment in this case, significant probative weight is assigned to the conclusions of the State Agency expert who evaluated the record in this case along with the findings made by Dr. Suradi discussed in the previous paragraph (Exs. 7A, 28F).

The ALJ assigned Dr. Moore and Dr. Suradi's opinions "significant probative weight." (Tr. 61). However, the ALJ made it clear that he viewed Dr. Suradi's determination that Villalba could lift and carry one-hundred pounds as "obviously flawed" and as the result of Dr. Suradi's failure to examine the full treatment record. (Tr. 61). Therefore, the ALJ credited only those findings of Dr. Suradi which were "consistent with the longitudinal record."

It is the ALJ's job to determine what weight to give medical opinion evidence, and the ALJ here gave proper consideration of the objective medical evidence when evaluating the medical opinion evidence in this record. "The power to judge and weigh evidence includes the power to disregard" evidence, and the ALJ exercised this power appropriately. *See Greenspan v. Shalala*, 38 F.3d 232, 238 (5th Cir. 1994). This factor weighs in favor of the ALJ's decision.

## C. Subjective Evidence of Pain

The next element to be weighed is the subjective evidence of pain, including the claimant's testimony and corroboration by family and friends. Not all pain is disabling, and the fact that a claimant cannot work without some pain or discomfort will not render him disabled. *Cook*, 750 F.2d at 395. The proper standard for evaluating pain is codified in the Social Security Disability Benefits Reform Act of 1984, 42 U.S.C. § 423. The statute provides that allegations of pain do not constitute conclusive evidence of disability. There must be objective medical evidence showing the existence of a physical or mental impairment which could reasonably be expected to cause pain. Statements made by the individual or his physician as to the severity of the plaintiff's pain must be reasonably consistent with the objective medical evidence on the record. 42 U.S.C. § 423. "Pain constitutes a disabling condition under the SSA only when it is 'constant, unremitting, and wholly unresponsive to therapeutic treatment." *Selders*, 914 F.2d at 618-19 (citing *Farrell v. Bowen*, 837 F.2d 471, 480 (5th Cir. 1988)). Pain may also constitute a

non-exertional impairment which can limit the range of jobs a claimant would otherwise be able to perform. *See Scott v. Shalala*, 30 F.3d 33, 35 (5th Cir. 1994). The Act requires this Court's findings to be deferential. The evaluation of evidence concerning subjective symptoms is a task particularly within the province of the ALL, who has the opportunity to observe the claimant. *Hames*, 707 F.2d at 166.

Here, Villalba testified about her health and its impact on her daily activities. She offered no testimony or corroboration from her family or friends with respect to her complaints about her condition. Although Villalba was fired from her most recent job as a receptionist for reasons unrelated to her alleged physical or mental impairments, she testified that she would be unable to do the same work today because, although it was not physically demanding, it was very emotionally demanding. (Tr. 82). Villalba explained that she was certain that her weight gain of nearly 160 pounds was not food related, but was due to the medications she was being prescribed for anemia and back pain. (Tr. 84, 95). She stated that her medication "knocks her out," and that it takes her awhile to "function properly or normally as much as I can." (Tr. 85). Her blood pressure is controlled by the medications she is prescribed, but the side effects of those medications include excruciating headaches and worsening of her vision to the point where she can hardly see. (Tr. 86). It takes about three hours for these side effects to subside (Tr. 86). However, Villalba later told the ALJ that the headaches, which she suffers every day, are relieved in thirty minutes by taking an Excedrin Migraine. (Tr. 92). She stated that the pain in her back "comes and goes," but also said that it keeps her from sleeping most nights. (Tr. 92-93).

Villalba estimated that she could lift four or five pounds, could sit for no more than thirty minutes, stand for no longer than ten minutes, and was unable to walk very far on her own without holding onto something for support. (Tr. 86-87, 101). Yet, Villalba stated that she walks

around the house and outside as much as she can for exercise. (Tr. 98). Regarding her day-to-day activities, Villalba stated that she cleans her house with no problem, which includes sweeping, folding the clothes, and folding the beds. (Tr. 102).

Claimant has to be on oxygen "24/7" because of her chronic obstructive pulmonary disease. (Tr. 88). She told the ALJ that she uses her CPAP machine every day, and that it does not help her sleep at all. (Tr. 93).

Regarding her carpal tunnel syndrome, Villalba described a tingling sensation and a sharp pain that lasts once a day for about an hour. (Tr. 90). She stated that she has problems holding or grasping things. (Tr. 90). For example, she said that she would be unable to pick up coins from a tabletop, and that she has stopped driving herself for fear of causing an accident. (Tr. 91).

The ALJ then found that "claimant's statements concerning the intensity, persistence and limiting effects of these symptoms" were not entirely credible. The ALJ wrote:

> Somewhat consistent with the allegations of the claimant, the record of medical treatment in this case shows that she is morbidly obese with a body mass index of sixty-three percent and that she has degenerative disc disease of the lumbar spine, bilateral carpal tunnel syndrome, sleep apnea, chronic obstructive pulmonary disease with oxygen use and hypertension. However, somewhat remote treatment records indicate that she underwent an x-ray of her chest in October 2012 that was negative for abnormalities along with an unremarkable CT scan of her chest the following month along with contemporaneous echocardiograms that showed that her left ventrivular ejection fraction was fifty-five to sixty percent at that time. Although she was followed for high blood pressure, obesity, anemia, carpal tunnel syndrome and pulmonary disease in January 2013, a contemporaneous neurological examination performed on the claimant was normal at that time and she exhibited no focal deficits. It appears that the claimant's neurological functioning remained stable through May 2013 and that her blood pressure was stabilized through compliance with appropriately prescribed medication in spite of her obesity (Exs. 1F-6F, 9F-11F, 14F, 20F-22F, 25F).

> Additional treatment records show that the claimant underwent an additional examination of her cardiovascular system in July 2013 that revealed no hemodynamically significant coronary artery disease with a normal ejection fraction at that time. Somewhat consistent with the allegations of the claimant, contemporaneous x-rays performed on the lumbar region of her spine revealed degenerative changes at the L2-3 vertebral level and mild degenerative changes in her thoracic spine. In addition, a concurrent physical

examination showed that she had moderate tenderness in the area of her lumbar spine at that time. Emergency treatment records show that the claimant required urgent care for her moderate back pain in August 2013 and that she underwent magnetic resonance imaging of her lumbar spine on August 20, 2013 that revealed that she has a paracentral disc protrusion at the L5-S1 vertebral level without spinal or foraminal stenosis (Exs. 1F-6F, 9F-11F, 14F, 20F-22F, 25F).

Although the claimant continued to complain of back pain through September 2013, the pain declined to a level characterized as "mild" in nature by her treating physician in September 2013. Consistent with the characterization of her pain level as "mild," contemporaneous medical progress notes indicate that the claimant was able to perform full ranges of motion in all of her joints at that time. In addition, the claimant was observed walking with a normal gait and she exhibited normal strength and tone in all of her muscle groups. It is noted that the claimant presented for treatment of her diverse impairments in October 2013 and continued to exhibit obvious spasms and tenderness in her back along with stiffness associated with flexion of her lumbar spine. However, the claimant continued to present walking with a normal gait and to exhibit normal neurological functioning with no focal deficits through November 2013 (Exs. 1F-6F, 9F-11F, 14F, 20F-22F, 25F). (Tr. 60–61)

The undersigned finds that there is nothing in the record to suggest that the ALJ made improper credibility findings, or that he weighed the testimony improperly. Accordingly, this factor also supports the ALJ's decision.

### D. Education, Work History, and Age

The fourth element to be weighed is the claimant's educational background, work history and present age. A claimant will be determined to be under disability only if the claimant's physical or mental impairments are of such severity that she is not only unable to do his previous work, but cannot, considering her age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. § 423(d)(2)(A).

The record shows that the ALJ questioned Scott Brown, a vocational expert ("VE"), at the hearing. "A vocational expert is called to testify because of his familiarity with job requirements and working conditions. 'The value of a vocational expert is that he is familiar with the specific requirements of a particular occupation, including working conditions and the

attributes and skills needed.'" *Vaughan v. Shalala*, 58 F.3d 129, 131 (5th Cir. 1995) (quoting *Fields v. Bowen*, 805 F.2d 1168, 1170 (5th Cir. 1986)). It is well settled that a vocational expert's testimony, based on a properly phrased hypothetical question, constitutes substantial evidence. *Bowling v. Shalala*, 36 F.3d 431, 436 (5th Cir. 1994). A hypothetical question is sufficient when it incorporates the impairments which the ALJ has recognized to be supported by the whole record. Beyond the hypothetical question posed by the ALJ, the ALJ must give the claimant the "opportunity to correct deficiencies in the ALJ's hypothetical questions (including additional disabilities not recognized by the ALJ's findings and disabilities recognized but omitted from the question.)" *Bowling*, 36 F.3d at 436.

The ALJ posed comprehensive hypothetical questions to the VE. (Tr. 104-107). A hypothetical question is sufficient when it incorporates the impairments which the ALJ has recognized to be supported by the whole record. Upon this record, there is an accurate and logical bridge from the evidence to the ALJ's conclusion that Villalba was not disabled. Based on the testimony of the vocational expert and the medical records, substantial evidence supports the ALJ's finding that Villalba could perform her past relevant work as a sedentary, semi-skilled medical receptionist and admissions clerk on a sustained basis. (Tr. 61). The Court concludes that the ALJ's reliance on the vocational testimony was proper, and that the vocational expert's testimony, along with the medical evidence, constitutes substantial evidence to support the ALJ's conclusion that Villalba was not disabled within the meaning of the Act and therefore was not entitled to benefits. Further, it is clear from the record that the proper legal standards were used to evaluate the evidence presented. Accordingly, this factors also weighs in favor of the ALJ's decision.

**V. Conclusion**

Considering the record as a whole, the Court is of the opinion that the ALJ and the Commissioner properly used the guidelines propounded by the Social Security Administration, which direct a finding that Villalba was not disabled within the meaning of the Act, that substantial evidence supports the ALJ's decision, and that the Commissioner's decision should be affirmed. As such, it is

ORDERED Defendant's Motion for Summary Judgment (Document No. 20) is GRANTED, and the decision of the Commissioner of Social Security is AFFIRMED.

Signed at Houston, Texas, this 21st day of June, 2018

FRANCES H. STACY
UNITED STATES MAGISTRATE JUDGE